[Civ. No. 19620. First Dist., Div. One. Feb. 13, 1962.]

WILLIAM F. RASH, Plaintiff and Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents.

Ernest H. Norback for Plaintiff and Appellant.

Dion R. Holm, City Attorney, and Donald J. Garibaldi, Deputy City Attorney, for Defendants and Respondents.

TOBRINER, J.—In a day when the use of the motor vehicle is almost universal and the knowledge of its propensities is common, we are constrained to hold that the trial court should have admitted the testimony of two witnesses who would have described the speed of a municipal bus; we believe the exclusion of the testimony constituted prejudicial error. We have also decided that the testimony of one of the physicians who treated appellant should likewise have been admitted.

The record discloses that on April 18, 1957, at about 7 p. m., appellant, driving in a northerly direction on Connecticut Street in San Francisco and ascending a 13 per cent grade, approached the intersection of Connecticut and 25th Streets. At the same time, respondent McKitric operated a city and county bus in a westerly direction on 25th Street, descending a 16 per cent grade. The bus approached the same intersection. In the intersection the bus and automobile collided; the accident caused damage to both vehicles and personal injuries to appellant.

At the trial appellant called two witnesses, Alice Walker and Julia Downing, who sought to testify as to the speeds of the vehicles prior to the accident. The first witness, Alice Walker, stated that while walking along Connecticut Street, near 25th Street, she saw appellant's car pass her as it travelled up the hill toward the intersection. She testified that the car "slowed down but not to stop, it almost did stop." The witness stated that she heard the bus coming down the hill and "I looked over here and it was coming at high speed and very fast." The court ordered her statement stricken.

Later, Miss Walker, after describing the movements of the two vehicles, testified that "the bus was coming up here at a high speed." Ruling that "a foundation must be laid" for a question as to speed, and that the statement constituted a "conclusion," the court ordered the remark stricken. At other points in Miss Walker's testimony, the court, in sustaining objections by respondents, accepted respondents' position that the necessary foundation for admission of such testimony required an ability on the part of the witness to state speed in terms of miles per hour as well as an ability to drive a car. Miss Walker did not disclose whether or not she could estimate speed in terms of miles per hour, but she did state that she did not drive a car. She also demonstrated that although shrubbery obstructed her view of the lower part of the bus she had ample opportunity to observe it as it approached the intersection. While she was permitted to testify, without objection, that the bus was moving faster than appellant's automobile and that the automobile entered the intersection before the bus, the court struck five statements by the witness that the bus was travelling "fast" or at a "high speed."

The second witness, Julia Downing, a passenger on the bus, attempted on several occasions to testify as to the speed of the bus, but the court likewise excluded her testimony. While

Mrs. Downing did not drive a car, she had ridden in cars and buses for 20 years and she had travelled on this particular bus line for 13 years. The court did not permit her either to estimate the speed of the bus or to state whether the bus moved faster or slower than usual on the night in question. While it is true that Mrs. Downing did not state that the bus proceeded at any particular speed in terms of miles per hour, she had no opportunity to do so. Because she was thrown to the floor of the bus at or just before the vehicles collided Mrs. Downing did not actually see the collision.

For the purpose of introducing their version of the speed of the vehicles respondents called two witnesses, Gladys Gentry and Gary Facey, both passengers on the bus. When Mrs. Gentry sought to testify as to the speed of the vehicles, appellant objected on the ground that the only distinction between her qualification for such testimony and that of Mrs. Downing lay in the fact that Mrs. Gentry drove a car. The court overruled the objection. The witness testified that appellant "was coming up very fast"; he let up on the gas, then stepped on the gas and "shot out" after the bus had already entered the intersection; the bus unsuccessfully swerved to avoid the collision. She said that the bus went "very slowly"; thereafter she stated that the bus travelled "at a moderate rate of speed and he [McKitric] was tapping his brakes." On cross-examination, Mrs. Gentry admitted telling an investigator that she could not estimate the speed of either vehicle; the best she could do was to say whether "they are going too fast or too slow."

Respondents' second witness, 17-year-old Gary Facey, stated that he drove automobiles and had owned three; the court considered these assertions a sufficient foundation to allow him to testify as to the speed of the vehicles. On cross-examination it developed that he had only driven a car for a month prior to the accident; he had not driven a truck at the time; he did not then own a car. Facey testified that he first saw the car when it was 75 feet, and the bus 30 feet, from the intersection. At that time the bus proceeded at 15 miles per hour "or a hair under," and the car, at 25 miles per hour; then the car started to speed up, attaining a speed of about 35 miles per hour. The bus swerved left prior to the collision; it entered the intersection before the automobile.

Appellant himself testified that he travelled from 26th Street to 25th Street at 20 miles per hour; as he approached 25th Street, he slowed to 10 or 20 miles per hour. Appellant stated

that after he had moved into the intersection the bus proceeded down the hill at approximately 50 miles per hour. On the other hand, respondent McKitric testified that his highest speed coming down the hill was from 15 to 20 miles per hour, that he travelled at 10 to 15 miles per hour as he entered the crosswalk and slowed to 10 miles per hour or less in the intersection.

We turn now to a synopsis of the testimony relating to a second issue of the case: the extent of appellant's injuries. Appellant testified that the position of his body after the accident was such that "his shoulders and head" were "out of the car on the pavement"; that he was partly unconscious and finally struggled to his feet. Miss Walker testified that she ran to the car after the collision and saw appellant on his hands and knees on the sidewalk using the car to pull himself to his feet. Gary Facey said he saw appellant get out of the car unassisted.

An ambulance took appellant to an emergency hospital, where, after obtaining X-rays, those in charge released him the following day. Because of a stiffness in his back and left leg, appellant later sought further medical treatment, and a Dr. Joseph placed him in the hospital. Thereafter Dr. Citret treated appellant's back and head injuries, conducted electro-encephalogram tests which indicated brain damage, and consulted Dr. Shev, who specializes in neurology.

Dr. Shev testified that appellant experienced spells of dizziness and amnesia which the doctor said resulted from an epileptic condition caused by a blow on the head. Dr. Shev stated that, in his opinion, the accident caused this epileptic condition.

Dr. Citret, who specializes in surgery, gave a full account of appellant's physical condition and the treatment he received in the hospital. The doctor was then asked if he could describe the mechanics of the head injury which would produce the symptoms he had observed while treating appellant. Dr. Citret explained that the "fluctuation blood pressure and a reciprocal fluctuation in his pulse rate . . . in conjunction with the history of the blow to the head, a period of unconsciousness thereafter, swelling of the scalp on the side of the head and the electroencepholographic changes make it perfectly clear that there was considerable damage to Mr. Rash's brain." The court, however, did not permit the doctor to express an opinion as to whether the accident caused the head injury. The court ruled that only a neurologist could state

an opinion upon this point; the court also held that Dr. Citret could not testify that appellant suffered from a permanent cerebral concussion.

We believe the court erroneously excluded the testimony of appellant's two witnesses who would have testified as to the speed of the bus; we think, likewise, that the court erred in excluding Dr. Citret's testimony as to the cause of appellant's head disability. We consider each of these points seriatim.

1. *The exclusion of testimony relating to speed.*

 Respondents concede error as to the exclusion of the testimony of Miss Walker and Mrs. Downing but contend that the exclusion did not work prejudice. Indeed there is little question but that, "A person having the opportunity to observe the speed of a moving vehicle is qualified to give his opinion as to such speed, and his previous experience or lack of experience goes to the weight rather than to the competency of the testimony." (*Jordan* v. *Great Western Motorways* (1931) 213 Cal. 606, 612 [2 P.2d 786] ; see also *Shropshire* v. *Pickwick Stages* (1927) 85 Cal.App. 216 [258 P. 1107] ; *Atchley* v. *Finley* (1943) 57 Cal.App.2d 21, 28-29 [133 P.2d 823] ; 70 A.L.R. 540, 547; 94 A.L.R. 1190, 1192.)

 Furthermore, "testimony as to speed, couched in general language such as 'very fast,' 'mighty fast,' etc., is admissible." (*Bennett* v. *Central California Traction Co.* (1931) 115 Cal. App. 1, 11 [1 P.2d 47] ; see also *Scragg* v. *Sallee* (1914) 24 Cal.App. 133, 141 [140 P. 706] ; *Kramm* v. *Stockton Electric R.R. Co.* (1913) 22 Cal.App. 737 [136 P. 523] ; *Bowman* v. *Motor Transit Co.* (1930) 208 Cal. 652 [284 P. 443] ; *Dawson* v. *San Diego Elec. Ry. Co.* (1927) 82 Cal.App. 141, 151 [255 P. 215].)

 Respondents would negate any prejudice which may have resulted from the error by emphasizing the fact that the excluded testimony consisted of general statements and that, since the witnesses did not drive cars, their observations would carry little weight with the jury. The argument fails, however, in the light of the contradiction in, as well as the importance of, the testimony as to the speed of the involved vehicles.

The record presents a startling diversity of opinion as to the speed of the vehicles, particularly the speed of the bus. The testimony placed the speed of the bus at various points in a range from 10 to 50 miles per hour; one witness said that the bus moved down the hill "very slowly," while another would have testified, if permitted, that the bus did so "at a high speed and very fast." Such disparity is not the fine-

spun differences of experts; it is gross and wide. In the face of it the jury would be compelled to accept one or the other version, and it is no answer to say that the jury would not be influenced because the witnesses were not experts in driving cars or determining speed. The most untrained observer should distinguish between speeds of 10 and 50 miles per hour, between very slow and very fast. The exclusion of testimony so crucial and so beneficial to appellant might well have influenced the jury's deliberations and have effected a difference in the resulting verdict. Such testimony, indeed, becomes even more important because the only other testimony in appellant's favor consisted of his own self-serving statements.

Respondents' contention that the exclusion of the Downing and Walker testimony could not have had much effect upon the jury, because the witnesses did not relate the movement of the vehicle to miles per hour, meets a three-fold answer. In the first place the court did not permit Mrs. Downing to testify as to exact speed, although she desired to do so; in the second place, we are not able to draw so fine a line as to say a jury would be influenced only by specific and not general descriptions of speed; in the third place, respondents' own witness, Mrs. Gentry, was also unable to estimate speed in terms of miles per hour.

Because of the imbalance of the testimony as to speed and because the admission of the excluded testimony would have tended to equalize the showing of each party, the admonition of *People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243], becomes pertinent: "[A] reversal will result only when there exists, in the opinion of the court, at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result."

In view of the weight of the issue of speed we entertain that serious doubt in the instant case.

2. *The exclusion of Dr. Citret's testimony relating to the cause of appellant's head disability.*

While a long line of California cases establish the rule that the trial court determines "the competency and qualification of a witness to state an expert opinion . . . and in the absence of a clear showing of abuse of discretion its ruling on such a matter will not be disturbed on appeal" (*Krister* v. *Kuttruff* (1961) 197 Cal.App.2d 102, 106 [16 Cal.Rptr. 872]; see also *People* v. *Busch* (1961) 56 Cal.2d 868, 878 [16 Cal.Rptr. 898, 366 P.2d 314]), we believe the

exclusion of the expert testimony worked prejudicial error here.

As respondents apparently concede, a physician or surgeon is not precluded from testifying as an expert because he is not a specialist in the particular area of medicine involved in a case; such lack of specialization goes only to the weight of the testimony. (*Estate of Gore* (1953) 119 Cal. App.2d 796, 799 [260 P.2d 859].) The courts draw a distinction between expert testimony which seeks to describe the medical condition, or the cause of a condition, of a patient, and expert testimony which proposes to explain the medical techniques pursued by specialists. In the latter case, a general practitioner, not specially trained, lacks the necessary qualification. He may, however, testify as to matters within the knowledge and observation of every physician, whether or not he is a specialist. (*Thompson* v. *City of Long Beach* (1953) 41 Cal.2d 235, 241 [259 P.2d 649].)

Dr. Citret treated appellant, acquired familiarity with his condition and apparently was the first physician to detect possible brain damage. A surgeon who conducts electroencephalogram tests to determine the existence of brain damage will not in all likelihood be ignorant of the symptoms or basic physical causes of such damage. It is equally unlikely that such a surgeon would not be able to determine whether a blow to the head might cause such a condition. We must conclude that the court abused its discretion in excluding Dr. Citret's testimony as to these matters.

Respondents contend that, even though the court excluded Dr. Citret's testimony on an erroneous ground, the court could have properly excluded it as cumulative, and that therefore no error resulted. With the exception of the issue of negligence, however, the matter of the extent and cause of appellant's injuries became the most important issue in this case. While Dr. Shev testified that appellant's disability consisted of a permanent susceptibility to convulsions, respondents sought by cross-examination to meet and rebut this assertion. Dr. Citret's stricken statement that appellant suffered a permanent cerebral concussion would have tended to corroborate Dr. Shev's opinion. Since the code section admonishes the court that it "may stop the production of further evidence upon any particular point when the evidence upon it is already so full as to preclude reasonable doubt" (Code Civ. Proc., § 2044), we cannot, in view of respondents' attempt to raise some doubt as to Dr. Shev's opinion, hold the testimony

of Dr. Citret to be cumulative. Moreover, respondents make no showing that the court actually exercised its discretion and found the evidence cumulative. Hence we are not even involved in the question as to whether or not the court abused its discretion in ruling upon the alleged cumulative nature of the testimony.

The question of the injuries sustained by appellant is a crucial one; the doctor's testimony would have aided the jury in reaching a verdict; the court's exclusion of it impaired an important function reserved for the jury, and thereby curtailed appellant's opportunity for a full presentation of his case.

The two errors which we have described *supra,* and which respondents in effect have admitted, reach too deeply into the essence of this case to dismiss them as nonprejudicial. Our conclusion is that they may well have affected the jury's verdict.

We reverse the judgment.

Bray, P. J., and Sullivan, J., concurred.